UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                    :

OSVALDO PATRIZZI,                       :

                                :                11 Civ. 2386 (PAE)

                        Plaintiff,       :

                                :                <u>OPINION & ORDER</u>

                 -v-                     :

                                :

BOURNE IN TIME, INC. et al.,         :

                                :

                      Defendants.    :

                                :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Osvaldo Patrizzi brings this action against defendants Bourne in Time, Inc.

("Bourne"), Antiquorum S.A., Antiquorum USA, Inc., (together, "Antiquorum"), Evan

Zimmerman, and William Rohr (collectively, "defendants").  Patrizzi alleges, *inter alia*, that

defendants violated the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, by using internet domain names

that allegedly infringed on several common law trademarks incorporating Patrizzi's personal

name, which Patrizzi alleges are his own trademarks entitled to protection.  Defendants move for

summary judgment on Patrizzi's Lanham Act claims, arguing that they purchased the right to use

Patrizzi's name, and therefore were entitled to use the allegedly infringing domain names.  For

the reasons that follow, defendants' motion is denied.

# I.    Background

## A.    Overview of the Parties and Allegations[1]

Patrizzi is a well-known timepiece expert and auctioneer.  In 1974, Patrizzi founded an auction house that would come to be named Antiquorum and which he would build into a successful multi-national entity.  In 2005, Patrizzi sold his interest in Antiquorum to Artist House Holdings, Inc. ("Artist House").  Although Patrizzi initially remained on Antiquorum's board, in 2007, he left on disputed terms.  Litigation ensued, in multiple courts and countries.

This motion involves one set of Patrizzi's claims in this Court: that defendants infringed several common law trademarks belonging to him.  In 2008, after leaving Antiquorum, Patrizzi founded Patrizzi & Co. Auctioneers, another timepiece auction house, and registered the domain name "patrizziauction.com."  Patrizzi claims that he owns the common law trademarks "Osvaldo Patrizzi," "Patrizzi & Co. Auctioneers," and "patrizziauction.com."  In October 2010, Patrizzi discovered that upon typing certain slight misspellings[2] of Patrizzi's registered domain name into the navigation bar of a web browser, one would be redirected to a website, "timezone.com," owned by defendant Bourne.  That site, in turn, would direct users to another site,

---

[1] The Court's account of the underlying facts in this case is drawn from the parties submissions in support of and in opposition to this motion, including: defendants' Local Rule 56.1 Statement (Dkt. 89) ("Def. 56.1"); plaintiff's Local Rule 56.1 Statement (Dkt. 96) ("Pl. 56.1"); the Declaration of Jocelyn Jacobson in Support of Defendants' Motion for Summary Judgment (Dkt. 91) ("Jacobson Decl."); the Declaration of Evan Zimmerman in Support of Defendants' Motion for Summary Judgment (Dkt. 92) ("Zimmerman Decl."); the Declaration of Osvaldo Patrizzi in Opposition to Defendants' Motion for Summary Judgment (Dkt. 93) ("Patrizzi Decl."); the Declaration of Leo Verhoeven in Opposition to Defendants' Motion for Summary Judgment (Dkt. 95) ("Verhoeven Decl."); and the Declaration of Michael Haskel in Opposition to Defendants' Motion for Summary Judgment (Dkt. 102) ("Haskel Decl.").  Additionally, the Court considers the depositions of the following witnesses:  Osvaldo Patrizzi, Jacobson Decl. Ex. C ("Patrizzi Dep."); Philip Poniz, Haskel Decl. Ex. P ("Poniz Dep."); Leo Verhoeven, Jacobson Decl. Ex. E ("Verhoeven Dep."); and Michael Levine, Jacobson Decl. Ex. N ("Levine Dep.").

[2] The alleged infringing domain names are:  "oswaldopatrizzi.com," "patriziauction.com," "patrizziauctioneers.com," and "patrizziauctions.com".

"antiquorum.com," which belongs to Bourne's parent company, defendant Antiquorum.[3] Patrizzi alleges that defendants sought to profit off the goodwill associated with Patrizzi's name by confusing consumers into thinking that they were participating in auctions approved by or associated with Patrizzi.

### B.     Procedural History

On April 7, 2011, Patrizzi filed the Complaint in this action.  Dkt. 1.  He brought three claims under the Lanham Act, three claims under the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, and four claims under New York statutory and common law.  Defendants moved to dismiss the Complaint.  On October 11, 2012, the Court issued an Opinion & Order, dismissing Patrizzi's RICO claims.  Dkt. 61 ("Op."), *available at* No. 11 Civ. 2386 (PAE), 2012 WL 4833344 (S.D.N.Y. Oct. 11, 2012).  However, that Opinion denied defendants' motion to dismiss Patrizzi's Lanham Act claims.  Op. 11–14.[4] Defendants had argued that they were entitled to use the domain names at issue because they had purchased the right to use Patrizzi's name as a mark when Artist House purchased Patrizzi's interest in Antiquorum in 2005.  The Court held that, at the motion to dismiss stage, it was required to credit Patrizzi's assertion that he was the personal owner of the marks at issue.  *Id.* However, because this was a potentially dispositive issue, the Court directed expedited discovery on the following questions:  "(1) whether Patrizzi or another individual is the 'owner' of the asserted trademarks, and (2) what effect, if any, the 2005 Antiquorum sale had on such ownership."  *Id.* at 14–15.

---

[3] As referred to herein, Antiquorum consists of Antiquorum S.A., a Swiss corporation, and Antiquorum USA, Inc., a New York corporation.  Defendants Zimmerman and Rohr were at all relevant times principals of Antiquorum.

[4] The Court also retained supplemental jurisdiction over Patrizzi's state law claims.  Op. 15.

On April 29, 2013, Patrizzi voluntarily dismissed one of his three Lanham Act claims, with prejudice.  Dkt. 87.  Thus, two Lanham Act claims remain: false designation of origin, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and federal trademark cyberpiracy, in violation of § 43(d) of the Lanham Act, 15 U.S.C. § 1125(d).

On May 7, 2013, defendants moved for summary judgment on the Lanham Act claims, arguing that, based on the record assembled during the targeted discovery period, defendants own the right to use Patrizzi's name.  Dkt. 90 ("Def. Br.").  On June 5, 2013, Patrizzi opposed that motion.  Dkt. 101 ("Pl. Br.").  On June 19, 2013, defendants filed a reply.  Dkt. 103 ("Def. Reply Br.").

### C.     Patrizzi's Name as a Mark

Patrizzi was born in 1945.  Patrizzi Dep. 5.  He grew up in Italy and Switzerland, and has been involved in the purchase, sale, and repair of watches since age 13.  Patrizzi Decl. ¶ 2; Patrizzi Dep. 5–6.  At age 16, he opened his own watch- and clock-making firm, and by age 21 he was an expert working for the Association of Antiquities in Milan.  Patrizzi Dep. 6.  In 1974, Patrizzi and a friend named Gabriel Tortella started an auction house for timepieces in Geneva, Switzerland.  Patrizzi Decl. ¶ 3; Patrizzi Dep. 7–9.  In 1981, the company's name was changed to Antiquorum; in 1984, Patrizzi bought Tortella's interest in the company.  Patrizzi Dep. 7–9. Antiquorum eventually expanded to include several related companies; at its peak, Antiquorum had approximately 50 employees working at offices in Geneva, Hong Kong, New York, Japan, Milan, London, Paris, and Shanghai.  Patrizzi Decl. ¶¶ 4, 8; Patrizzi Dep. 8–9; Verhoeven Decl. ¶¶ 2, 13.  Patrizzi was the Chief Executive Officer of Antiquorum between its inception and 2007, the co-chairman of its board of directors between 1981 and 2005, and the sole chairman of the board between 2005 and 2007.  Patrizzi Decl. ¶ 5.

By the early 1980s, Patrizzi had become well known in the timepiece industry, based on his development of the first website for online timepiece auctions, and his expertise in evaluating and auctioning timepieces.  *Id.* ¶¶ 6–7; Patrizzi Dep. 21; Verhoeven Decl. ¶ 5.  For the more than 30-year period following Antiquorum's founding, Patrizzi was associated with Antiquorum.  Patrizzi Dep. 20; Poniz Dep. 23–24; Verhoeven Dep. 43–44.  Antiquorum developed a strong reputation in the timepiece industry, based at least in part on Patrizzi's work.  Poniz Dep. 12.  Patrizzi was commonly featured in periodicals extolling his and Antiquorum's success in the timepiece industry.  *See, e.g.*, Jacobson Decl. Ex. H (article in Swiss Style, titled "Antiquorum's Osvaldo Patrizzi: The genius of time" and describing him as "the man behind [Antiquorum's] success story"); Zimmerman Decl. Ex. H (article in Revolution USA, describing Patrizzi as "a man whose name has become synonymous with collectors' watches" and referring to Patrizzi and Antiquorum as "market juggernauts" and "tastemakers"); *see also* Jacobson Decl. Ex. I, K, L; Zimmerman Decl. Ex. F, G.

### D.    The 2005 Sale of Antiquorum

In a stock purchase agreement dated December 9, 2005 (the "Initial SPA"), Patrizzi and an entity called Habsburg Holdings Ltd. ("Habsburg")[5] agreed to sell shares of Antiquorum to an entity called Yokohama Information Technology Company Limited.  Zimmerman Decl. ¶ 3 & Ex. A.  The Initial SPA was amended by an addendum dated January 13, 2006, which substituted Artist House Holdings, Inc. ("Artist House") as the purchasing entity.  *Id.* ¶ 5 & Ex. D.  The

---

[5] Habsburg was the majority shareholder of Antiquorum.  Verhoeven Decl. ¶ 2.

terms of the Initial SPA were amended once again in an agreement (the "Final SPA") dated December 9, 2005, but executed in March 2006.  Zimmerman Decl. ¶ 6 & Ex. E.[6]

The Final SPA provides that, on closing, Patrizzi and Habsburg would sell 50% of the stock of Antiquorum to Artist House.  Final SPA § 1.1.  Pursuant to a consulting agreement executed by Patrizzi and Artist House that same day, Patrizzi would remain employed as the CEO of Antiquorum and chairman of its board of directors for an initial term of three years. Jacobson Decl. Ex. O.[7]  Upon Patrizzi's fulfillment of his duties, the other 50% of the stock of Antiquorum would be released from escrow to him.  *Id.* § 3(a)(i).  The Final SPA also provides that Antiquorum's inventory would be sold, with the proceeds up to 16 million Swiss Francs going to a third party, and the amount above that going to Patrizzi.  Final SPA §§ 2.1, 2.4; Def. 56.1 ¶ 32; Pl. 56.1 ¶ 32.

In the Final SPA, Patrizzi covenants that he does not have any interest in any competitor of Antiquorum; that he has "no property, real or personal, tangible or intangible, used in or pertaining to [Antiquorum's] business," *id.* § 3.20; and that he will not compete with Antiquorum for a period of six years, *id.* § 11.1.  Patrizzi served as chairman and CEO of Antiquorum until August 2007, *see* Patrizzi Decl. ¶ 19, meaning that he did not complete the full term contemplated in the consulting agreement, *see* Jacobson Decl. Ex. O.  The parties dispute the circumstances of his separation from Antiquorum—defendants assert that he resigned; Patrizzi argues that he was improperly ousted from the board.  *See* Def. 56.1 ¶ 41; Pl. 56.1 ¶ 41.

---

[6] Patrizzi denies that the Final SPA is effective, and asserts that the Initial SPA, as amended on January 13, 2006, is the effective agreement between the parties.  *See* Pl. 56.1 ¶ 28.  However, because the provisions of the two documents relevant to this motion are identical, Patrizzi concedes that the Final SPA is appropriately considered as the governing agreement for purposes of this motion.  *Id.*

[7] Patrizzi similarly disputes the effectiveness of this version of this agreement, but assumes for purposes of this motion that the version provided by defendants is applicable.  *See* Pl. 56.1 ¶ 34.

In April 2008, Patrizzi formed a competing auction house, Patrizzi & Co. Auctioneers. Patrizzi Decl. ¶ 21.  In February 2008, at Patrizzi's instruction, Leo Verhoeven, who was employed by Patrizzi at the time, registered the domain name "patrizziauction.com" in order to reserve the name for Patrizzi's new venture.  Verhoeven Decl. ¶ 14; Patrizzi Dep. 54; Verhoeven Dep. 39.  In late 2010, Patrizzi left his new business, after suffering a stroke, and the business closed a few months later.  Patrizzi Dep. 51–52, 58; Verhoeven Dep. 44; Poniz Dep. 18.

## II.        Applicable Legal Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."

*Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

**III.**      **Discussion**

In his Complaint, Patrizzi alleges that he owns the common law trademarks "Osvaldo Patrizzi," "Patrizzi & Co. Auctioneers," and "patrizziauction.com." Patrizzi asserts two claims under the Lanham Act based on defendants' use in commerce of the domain names that allegedly infringed on these marks: (1) false designation of origin under § 43(a); and (2) "cybersquatting" under § 43(d).

**A.**      **Legal Framework**

To prevail on his false designation of origin claim, Patrizzi must prove "(1) that the mark or dress is distinctive as to the source of the good or service at issue, and (2) that there is the likelihood of confusion between the plaintiff's good or service and that of the defendant." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 154 (2d Cir. 2007); *accord Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114–16 (2d Cir. 2006); *see* 15 U.S.C. § 1125(a)(1)(A). To prevail on his "cybersquatting" claim, Patrizzi must prove: "(1) [his] marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to [his] mark; and (3) that the defendant[s] ha[ve] a bad faith intent to profit from that mark." *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 323–24 (S.D.N.Y. 2010) (citing *Sporty's Farm, LLC v. Sportman's Mkt., Inc.*, 202 F.3d 489, 495 (2d Cir. 2000)); *see* 15 U.S.C. § 1125(d)(1).

However, as a preliminary matter, Patrizzi must first "demonstrate [his] own right to use the mark or dress in question." *Punchgini*, 482 F.3d at 154. Put differently, Patrizzi must show his "priority of right" over defendants to use the mark in question. *Id.* (quoting *P. Daussa Corp.*

*v. Sutton Cosmetics (P.R.) Inc.*, 462 F.2d 134, 136 (2d Cir. 1972)); *Study Logic LLC v. Clear Net Plus, Inc.*, No. 11 CV 4343 CLP, 2012 WL 4329349, at *6 (E.D.N.Y. Sept. 21, 2012); *Muniz v. Morillo*, No. 06 Civ. 6570 (RJS), 2008 WL 4219073, at *5 (S.D.N.Y. Sept. 10, 2008).  It is this threshold issue on which defendants' motion for summary judgment is based.  Defendants do not argue, for purposes of this motion, that Patrizzi's name was not a mark entitled to protection, *see* Def. Br. 1 n.2, 9 n.1, or that defendants' use created no likelihood of confusion.  Rather, defendants argue that they are the owners of the right to use Patrizzi's name, and therefore have the right to use the domain names at issue here.

An individual's personal name is protectable under the Lanham Act "only when it acquires secondary meaning," *Yarmuth-Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 993 (2d Cir. 1987), which "has been defined as the power of a name . . . to symbolize a particular business, product, or company."  *815 Tonawanda St. Corp. v. Fay's Drug Co.*, 842 F.2d 643, 647 (2d Cir. 1988); *accord Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 822 (2d Cir. 1986).  When an individual sells the right to use his name as a trademark or trade name, the parties' rights to use the name generally depend on the terms of the sale.  *See Madrigal*, 799 F.2d at 822–23 (an individual may sell the exclusive right to use his own name; alternatively, he may sell only the right to use his name as a trade name as part of that of another company or on other products, while retaining the right to take advantage of his individual reputation).

## B.     The Terms of Sale

Here, the terms of the Final SPA reveal little about what, if any, rights Patrizzi sold to Artist House when he sold his shares of Antiquorum.  The Final SPA has no provision concerning the transfer of goodwill or of the right to use Patrizzi's name.  The closest the Final SPA comes to addressing the issue is in § 3.20, which provides that no "Stockholder of the

Company"—a category which includes Patrizzi—"has any interest in any property, real or personal, tangible or intangible, used in or pertaining to [Antiquorum's] business."  But this disclaimer of rights by Patrizzi is a far cry from an affirmative grant to Artist House of those rights.  *See Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 102 (2d Cir. 1985) (in a stock purchase agreement, "the mere promise of forbearance by the Sellers [to use an individual's name] did not give a right of use of the buyers").  Although some negative implication might arise from Patrizzi's promise of forbearance, another provision of the Final SPA yields a contrary negative implication:  Section 3.25 specifies that that each subsidiary of Antiquorum shall have the right to use the Antiquorum name without the payment of royalties, but makes no mention of the right of any entity to use Patrizzi's name.  *See* Final SPA § 3.25.  Aside from these two provisions, the Final SPA has nothing to say about goodwill, trademarks, or any other transfer of rights other than the shares of Antiquorum.[8]  The Final SPA is ambiguous, therefore, as to whether the right to use Patrizzi's name was transferred in the sale.

Because the contract is ambiguous, the Court turns to the extrinsic evidence to determine its meaning.  *See JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) (court may properly consider extrinsic evidence as to the parties' intent where agreement is ambiguous).  It is no more helpful.  Each party offers its own version of the intentions of the parties during the negotiations of the Final SPA.  Defendant Zimmerman and one of the lawyers who participated in the drafting of the agreement attest that defendants specifically intended to purchase Patrizzi's name.  *See* Zimmerman Decl. ¶¶ 9–10 (the selling point of Antiquorum was Patrizzi and the

---

[8] The Final SPA makes references in its Recitals section to a letter of intent previously signed by the parties.  That letter expresses the intention of Artist House to "acquire one hundred percent (100%) of the assets of Antiquorum, including its name and good will."  Zimmerman Decl. Ex. B, C.  However, the letter of intent contemplates a completely different transaction—an asset sale—than the one eventually executed, and therefore has no relevance to this motion.

goodwill associated with his name); Levine Dep. 32, 65–66 (parties intended that right to use Patrizzi's name would be transferred).  Patrizzi and the former auditor of Antiquorum each attest that no such transfer was intended.  *See* Patrizzi Decl. ¶ 17 (the subject of assigning the right to his name never came up and Patrizzi did not intend to assign it); Verhoeven Decl. ¶¶ 10–12 (there was no document mentioning the assignment of Patrizzi's name, nor was that name listed as an asset on due diligence materials).  Faced with what amounts to self-serving testimony from each side on the ultimate issue, the Court cannot resolve as a matter of law, that the parties intended, or did not intend, to transfer the right to use Patrizzi's name as a mark.  *See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000) ("[T]he court may [only] resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary." (citation and alteration omitted)).[9]

Thus, the Final SPA and the negotiations that preceded it do not resolve the issue at hand.

## C.      Other Considerations

Defendants argue, nevertheless, that the contract's ambiguity on the issue is irrelevant, because Patrizzi's name was a trademark associated with Antiquorum's business, and therefore,

---

[9] The parties cite extensively to this Court's decision in *JBCHoldings NY, LLC v. Pakter*, No. 12 Civ. 7555 (PAE), 2013 WL 1149061, at *10 (S.D.N.Y. Mar. 20, 2013), each arguing that it favors their position.  But that case presented a slightly different issue.  There, the plaintiff was the alleged purchaser of the right to use an individual's name, and sought to bar the individual from making *any* use of her own name in business.  Accordingly, the Court observed that "[a]lthough an individual may sell the right to use his personal name, a court will not bar him from using that name unless his intention to convey an exclusive right to the use of his own name is clearly shown." *Id.* (quoting *Madrigal*, 799 F.2d at 822) (alterations omitted).  Here, by contrast, the plaintiff is the individual seeking to bar the alleged purchaser of his name from making use of that name.  Thus, the issue here is not whether the *exclusive* right to use the individual's name was transferred to another—which would demand a more explicit statement of such intention, *see Madrigal*, 799 F.2d at 822—but whether a more limited *non-exclusive* right to use Patrizzi's name in association with Antiquorum's business was transferred.

as a matter of law, must be presumed to have transferred to the purchaser, Artist House. *See* Def. Br. 10. Defendants are correct that, generally, "a trademark cannot be sold or assigned apart from t[he] goodwill it symbolizes," because "[t]here are no rights in a trademark apart from the business with which the mark has been associated; they are inseparable."[10] *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984); *accord Berni v. Int'l Gourmet Rest. of Am., Inc.*, 838 F.2d 642, 646 (2d Cir. 1988); *Marshak v. Schaffner*, No. 11 Civ. 1104 (DLC), 2012 WL 1658393, at *6 (S.D.N.Y. May 11, 2012). Because of this connection between a trademark and the business with which it is associated, "[i]t is well settled that 'when a business is sold as a going concern, trademarks and the good will of the business that they symbolize are presumed to pass with the sale of the business.'" *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) (alteration omitted) (quoting 3 McCarthy on Trademarks and Unfair Competition § 18:37 (4th ed. 2011)); *accord Madrigal*, 799 F.2d at 824 ("It is, of course, an accepted principle that when a business purchases a trade name the essence of what it pays for is the goodwill associated with that trade name."); *Speed Prods. Co. v. Tinnerman Prods.*, 179 F.2d 778, 782 (2d Cir. 1949). This is the case even where the terms of sale do not expressly mention the transfer of trademarks. *President Suspender Co. v. Macwilliam*, 238 F. 159, 162 (2d Cir. 1916) ("A sale of a business and of its good will carries with it the sale of the trade-mark used in connection with the business, although not expressly mentioned in the instrument of sale.").

---

[10] A trademark and its accompanying goodwill may be transferred independently of the underlying business where the assignee is producing a product that is substantially similar to that of the assignor such that consumers would not be deceived, or where there is continuity of management. *See Defiance Button Machine Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1060 (2d Cir. 1985); *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984); *Sik Gaek, Inc. v. Yogi's II, Inc.*, No. 10-CV-4077 (ARR)(VVP), 2013 WL 2408606, at *2 (E.D.N.Y. June 3, 2013); *BLT Rest. Grp. LLC v. Tourondel*, 855 F. Supp. 2d 4, 30 (S.D.N.Y. 2012).

However, where the trademark is a personal name, the issue is more complex. "[A] trade name or mark that has become identified with the skill or reputation of a particular individual cannot be separated from that individual's personality." *Rick v. Buchansky*, 609 F. Supp. 1522, 1534 (S.D.N.Y. 1985) (citation omitted). Where the individual's name is inextricably linked to the product or service, "the owner of the business cannot continue his use of the mark after the termination of the relationship," lest the public be misled "into assuming that the individual was still affiliated with the business." *Id.* (citation omitted); *accord Madrigal*, 799 F.2d at 825 n.5 ("Madrigal might commit a fraud of sorts on the public if it represented itself as possessing Levinson's personal skill when that skill was, in fact, dedicated to Cello."); McCarthy, *supra*, § 18.35 ("It could be a form of fraud for the buyer of a personal name mark to represent itself as possessing the seller's personal skill when in fact that person has sold out the business and is no longer connected with it."); 3 Callmann on Unfair Competition, Trademarks and Monopolies § 20.67 (4th ed. 2011) ("A name . . . which has become popular as the symbol of the personal skill or reputation of an individual cannot be separated from that individual's personality."). Thus, even assuming that the right to use Patrizzi's name passed to Artist House in the 2005 sale, the continuing right of Artist House (via Antiquorum) to use that name following Patrizzi's departure depends on whether Patrizzi's name was identified with his services personally, or whether it was simply associated with an impersonal business, *i.e.*, Antiquorum. *See* Callmann, *supra*, § 20.67. This is a question of fact. *Id.*

Patrizzi's reputation stems from a long career in the timepiece industry. On one hand, he opened his own firm by age 16 and was a recognized expert by age 21—well before he founded Antiquorum. Patrizzi Dep. 6. On the other, Patrizzi spent the large majority of his career in the industry as the CEO and chairman of Antiquorum. Patrizzi Decl. ¶ 5. And Patrizzi himself

testified that he had achieved his "global recognition as a leading horologist" by the 1980s, *i.e.*, while he was running Antiquorum.  Patrizzi Decl. ¶ 6; *see also* Verhoeven Dep. ¶ 5.  But although the documentary evidence—mainly in the former of magazine profiles of Patrizzi— consistently ties Patrizzi to Antiquorum, these articles also focus on Patrizzi's individual talents. *See* Jacobson Decl. Ex. H, I, K, L; Zimmerman Decl. Ex. F, G.  One article in particular captures the dilemma, when it states:  "Osvaldo Patrizzi is a man whose name has become synonymous with collectors' watches.  As the founder of Antiquorum, indisputably the dominant force today in the auctioning of the world's finest vintage and modern wristwatches, he has presided over the sale of some of the rarest, most exquisite and most avidly desired timepieces in the world." Zimmerman Decl. Ex. H.  Thus, the question has a chicken-or-egg quality:  Is Patrizzi's name famous because of its association with Antiquorum, or is Antiquorum famous because it is associated with Patrizzi's name?  The assembled evidence suggests that Patrizzi was the driving force behind Antiquorum's success.  But Patrizzi was not the only contributor.  Patrizzi Decl. ¶¶ 8, 18; Patrizzi Dep. 39; Verhoeven Decl. ¶ 13 (each attesting to the goodwill Antiquorum has from other sources).  In light of this conflicting evidence, the Court cannot determine, as a matter of law, whether Patrizzi's name—to the extent it has achieved secondary meaning—is inseparable from his individual personality or is merely associated with the impersonal business of Antiquorum.

Accordingly, the Court cannot determine whether Antiquorum's continued use of Patrizzi's name after he left the company in 2007 "commit[ted] a fraud of sorts on the public" by representing that Patrizzi continued to be associated with the company.  *Madrigal*, 799 F.2d at 825 n.5.  Accordingly, defendants' claim that they had the right to use the allegedly infringing domain names must await resolution by the factfinder.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment on the Lanham Act claim is denied, without prejudice to defendants' ability to move for summary judgment on other grounds after plenary discovery is completed on the other elements of plaintiff's Lanham Act claims. The Clerk of Court is respectfully directed to terminate the motion pending at docket entry 88.

The next conference in this case is scheduled for August 29, 2013, at 10:00 a.m. The Court is mindful that this litigation is but one of many lawsuits ongoing between the parties, that the relationship between counsel has been fractious, and that authorizing full-blown discovery on all claims, including state law claims, may well result in expensive discovery that is largely duplicative of discovery on claims being asserted in other forums. The Court accordingly remains interested in attempting to resolve the Lanham Act claims, which supply the sole source of federal jurisdiction, ahead of the state law claims, and only then determining whether to continue to exercise supplemental jurisdiction over the state law claims. To this end, the Court is contemplating, for the next phase of this litigation, authorizing discovery—but only to the extent relevant to the Lanham Act claims. To assist the Court in deciding how to proceed, the parties are directed to meet and confer, and to submit a joint letter to the Court, no later than August 16, 2013, addressing the following questions:

1. What discovery, concretely, remains to be taken on plaintiff's Lanham Act claims?

2. What discovery, concretely, remains to be taken on the parties' state law claims?

3. To what extent do the parties' state law claims asserted in this case overlap with claims asserted in other forums?

SO ORDERED.

_Paul A. Engelmayer_

Paul A. Engelmayer
United States District Judge

Dated: August 5, 2013
       New York, New York

16